312-0009, Julio Ramos, M.D. Accommodated by Thomas Plura v. Kewanee Hospital, Accommodated by John Toma Courts in the public rarely hear anything about, and that's how physicians review themselves or do peer review to determine whether or not they're competent to practice medicine. Now in Illinois we have a rule that's known as a rule of limited review, sometimes it's if in fact the medical staff bylaws are not followed or if there's fundamental unfairness in an issue. This basically is a fundamental fairness issue. It involves a physician at Kewanee Hospital who had his staff privileges revoked. Now the suspension has left a scarlet letter on this physician's head, just like a stamped tattoo, and it will follow him for the rest of his career. Now you're going to hear a little bit about a report, a CIMRO report, which was a report that the hospital used as a basis for issuing the summary suspension. The CIMRO report was an unsigned document drafted by a nurse that was purported to be the findings of the CIMRO physician. But what we don't have, nor were we ever allowed to have, was any discovery as to whether or not those were the actual opinions of the physician or whether the physician even actually held those opinions that were used in the CIMRO report. There are three pertinent cases relevant to this issue. The Adkins Supreme Court case that talks about fundamental fairness, and then there's this court's unpublished opinion in Cernovich, and then there's the Lowe case. And all of those cases talk about fundamental fairness. But under the bylaws in this particular case, the medical staff bylaws are really the contract with how peer review happens. The only avenue where the hospital could impose a summary suspension, and that's an immediate suspension where you don't have any right to anything, they just go in and say, you're done, put down your stuff, now we have to the imposition doesn't start until you've had your right of a hearing. A summary suspension is immediate. The only thing in the bylaws that allows a summary suspension is if a physician poses imminent danger to a patient or someone on the staff. And that's the way it should be. I argue in favor of the ability of hospitals to impose a summary suspension if it's not a doctor who poses a real imminent danger. In Lowe, in the Lowe case, the fourth district case that I argue, and I lost, was that the premise in Lowe was that of course the claim of imminent danger must be genuine and it must be imminent, otherwise it's arbitrary and capricious and it's contrary to the bylaws. And really that's what this case is about. We have a case where they sought out an opinion from the CIMRO report, and there was an original CIMRO report. The CIMRO report was a peer review report that was drafted by this nurse. And it came back, and it came back showing no evidence of imminent danger or imminent threat. Now this original report, I'll call it report one, was hidden from the physician. It was hidden from the board member. The CEO, when she got that back, the evidence of the trial showed, she sought out a new revised report with the words potentially imminent threat to patient safety. We never found any of that out until the trial. But why that's important is because it shows that the process was unfair. It shows that the CEO went out to get what she needed, and that was the magical thing to hang her head on to impose a summary suspension. Now the physician has a right to a fair hearing, and that physician requested it. And really there isn't any debate in this issue that the bylaws weren't followed. For example, the physician had a right to a fair hearing within five days of his request. That didn't happen. Physician had a right to a fair hearing within 15 days of the suspension. That didn't happen. I wouldn't be wasting your time here if we're just talking about little technical violations that I view like that. He got his fair hearing. But the defendant also, I mean, just as proof that this whole process was unfair, two days before his fair hearing, under the bylaws and under the state law, the Illinois Hospital Licensing Act, they have to give you materials. The physician who's suspended, they have to give him the materials so he can prepare for this fair hearing. Two days before the fair hearing, the hospital dropped 816 pages of materials. Now they had been timely requested, but they dropped 816 pages of materials in front of the doorstep and said, here, here you are. Now go prepare for your fair hearing. One might argue, what did that matter, Dr. Plurk? You won for this physician at the fair hearing. Yes, I did. We won. So those are errors that didn't matter. Well, I say what they do show is they show that the process was unfair. Now, requested the fair hearing. We held a fair hearing, and that's where the hospital and the involved physician and everybody agrees on a panel of physicians to hear this matter, just like really a trial would hear it. And that occurred, and the fair hearing panel found in favor of the physician. Not a single physician, not a single witness testified at the trial or at the fair hearing that the plaintiff, Dr. Ramos, posed an imminent danger. Not one individual. And the fair hearing panel came back in favor of Dr. Ramos. I believe there were ten physicians that testified. In any event, the hospital then reviewed that fair hearing report, and they treated it as advisory, advisory in nature, and chose to disregard it. Now what they did is they said, well, I'll tell you what, we're going to restrict your privileges, and they came up with this plan, we'll allow you to come back, we've already suspended your privileges, and that's reportable under the National Practitioner Data Bank, but, and we'll continue that, but if you agree to this and this and this, we'll give you your privileges back. And they hang their hat on that, that they say, well, we offered to give you your privileges back. No, no. The stamp of summary suspension already occurred, and he's got this A on his head. The only way to avoid that is to win at the fair hearing and win at the appellate review process at the hospital. The hospital, the physician, we request an appellate review panel. I think it's important, and this is really under the Adkins case. Adkins talks about can the entity, can there be unfairness in the process? Well, in this case, the hospital asked the physicians in the hospital to bring charges against the doctor, and they reviewed it and they found no basis, no basis at all. What happened is, the hospital brings, prosecutes the charges regardless of what the hospital physicians indicated. They were the prosecuting entity. When they got the favorable report back from the fair hearing panel, the panel that they approved, they disregarded that. And then, when they went to the appellate review, they were appealing, Dr. Ramos is appealing to the very body, the same people that issued the decision against him in the first place. And I argue that process is fundamentally unfair. And we talk about fundamental fairness, and you know, if I lose at the trial court level, I wouldn't expect to come up here and find the trial court judge sitting here ruling on whether or not he issued the correct decision. We have to have some independence here. You know, some of the things that I view wrong with this is, and I understand that there's a presumption under the law that administrative bodies will act in good faith, but I think we've sufficiently shown that good faith wasn't used in this. For example, the bylaws prohibit the prosecuting entities, the representatives of the physician or the representatives of the hospital from participating in the appellate review process. You know, we go to the fair hearing, Dr. Ramos wins the fair hearing, but then when it comes time for the appellate review, the bylaws say the individual representatives can't participate in those deliberations. Well I wasn't invited to participate. I represented Dr. Ramos. But the hospital's representative, Mark Brewers, was. And he got back and closed the door. And we don't know what happened, of course, because there's no appellate record, there's no transcript of those appellate review processes. The process is fundamentally unfair. Now they don't deny that that occurred, they're just saying that there's no proof that he intervened in a way that affected the ultimate denial of a reversal at the appellate review board. All of these things to me suggest we've got an unfair process. I want to quickly touch on what the errors made at the trial court level. The trial court level, the judge refused to allow any testimony by Dr. Ramos that he was, he won at the fair hearing level. The trial court level refused to allow, and we offered proof of this, the fair hearing panel, they refused to allow them to testify that Dr. Ramos had won at the fair hearing level. The only reason that it would ever go to an administrative review, normally, would be if the physician lost at the fair hearing panel. So the jury is left with this impression that the only reason it would have gone to appellate review is if he lost at the fair hearing panel. The judge determined that portions of the Simrell report could come in. Probably one of the biggest things that I see wrong with this is a process where you can have a nurse summarize the findings of a physician allegedly that are against another physician, and they can introduce that sheet of paper at the hospital level, and I, as a physician who's adversely affected, can never get at that physician. The judge did not allow us at the trial level to depose the alleged author of this report. The judge did not allow us to... I'm unclear on that. Did you subpoena the doctor? Yes. He moved to strike, and the judge, there was a hearing on that, and the judge ruled that was privileged and protected. We had a full hearing, and the judge struck the subpoena, and we were not allowed to depose the reviewing physician. We were not allowed to depose the nurse who drafted the report, and presumably the second report that was used against him. What we were finding was a piece of paper that we couldn't cross-examine. I have to touch on the penalty imposed. This case started out, and there was a, just basically, it was a declaratory judgment action. I did not request a jury trial. Through a confluence of a counterclaim, and we had a money damages claim, there was a delay in that, and I didn't ask for a jury trial, but when they filed their counterclaim, I moved for a jury demand, and the minute I did that, they dismissed voluntarily their counterclaim against us, and I was left with no jury demand. Under the Saddle Science case, I voluntarily dismissed. There had never been one allegation that there was a 219 violation or any discovery of use, and I exercised our right to refile under Saddle Science and request a jury trial. They had requested, in the first case, damages of $22,000. The court took it under advisement, but then signed an order saying you get $136. When we refiled, the defendant filed for a motion for costs of $22,000 related to the costs associated with the first case, which I might add, they used all of that stuff, all the depositions and whatnot, in preparation for the second case, but it's just a penalty. Now, obviously, the lower court was mad. They were upset. There was this argument about, we've gotten to this point, and it's going to inconvenience everybody, and as the Kaelin v. John Deere case says, I'm sorry, but that sometimes happens, but as long as the defendant had the right to appeal the dismissal for that due process, and my point is this $22,000 judgment of award of costs is not supported anywhere in the law, and it opens a whole big can of worms. I think I'm about out of time, so I appreciate your time. Thank you. Mr. Dettol? At the outset, I'm going to disagree with Mr. Porter because we are not here to talk about peer review. We are not here to talk about peer review. If you look at the Atkins case that we both referred to, the issues for trial in a summary suspension case are whether the hospital substantially complied with the medical staff bylaws or whether the hospital was not subject to any peer review judgments. This court, as was Judge Stangel's court, was not convened to review the hospital's substantive decision as to Dr. Ramos's clinical competency or professional qualifications. That subject is off limits under the rule of non-review as announced in the Atkins decision. In fact, both parties filed motions in limine before the trial to exclude all peer review material from being admitted at trial, based on the rule of non-review. That material is not admissible, it's excluded, and it is not proper evidence in a trial such as this. Counsel's made a bunch of arguments why he thinks the proceedings at the hospital fair hearing level were unfair or improper. I would submit to As your honors know, we are not here to revisit or second-guess the jury's decision. Those were all presented to the jury, and they were all rejected. The reason those issues are limited to whether the bylaws were substantially complied with is because, by state law, the hospital must adopt medical staff bylaws that govern the relationship between the hospital and the medical staff in conformance with Illinois law. That's a requirement of the Illinois Hospital Licensing Act. The hospital must enact bylaws that conform with the regulations in the Illinois Hospital Licensing Act. So if they do, and they substantially comply with their bylaws, by necessary inference they have complied with state law. And that's what happened in this case. The arguments counsel's made again to this court were made to the jury and rejected. They did not find a breach of the bylaws. There were perhaps some technical violations, but again, the relevant standard is substantial compliance. The hospital is not held to a standard of strict or perfect compliance. That's what the case law says. That's what the argument was made to the jury. That's what the jury instruction provided, and the jury found in favor of the hospital on those issues. Likewise, even assuming there was some fundamental in fairness, it was also the plaintiff's burden to demonstrate some resulting prejudice. And there was none shown. If it was argued to the jury, that too was rejected by the jury. So there was no violation of the bylaws that was proven, and there was no fundamental in fairness that was proven either. This is analogous, really, to the business judgment rule in the corporate context. That is, if there is sufficient evidence presented to the board of the hospital in this case, they properly deliberated, they acted in good faith, and they reviewed appropriate information, that decision is not second-guessed by the court. It is off-limits. It is deemed to be correct unless there's a breach of the bylaws or some fundamental unfairness demonstrated. With respect to the award of costs and expenses, counsel says there's no authority for that. I respectfully disagree. There were two lawsuits here, as you may know. There was the initial action and then the refiled action. The original action was prosecuted for almost 27 months before Judge Stengel, before there was a voluntary dismissal taken. This was not a simple voluntary dismissal. This was, as Judge Stengel expressly found, this dismissal was taken to avoid proceeding to trial. It was a direct violation of the court's case management order, and I would further suggest it was in derogation of the integrity of the court. I would suggest there's a subtle distinction between a voluntary dismissal taken for a proper purpose, where incidentally the trial date is then vacated. In this circumstance, the voluntary dismissal was taken, as the judge found expressly, to avoid going to trial. And we've cited in our briefs the Luna... But isn't the remedy, if you don't like the voluntary dismissal, isn't the remedy then to appeal it from the hospital? The only issue, yes, the defendant can appeal the voluntary dismissal order, but the only issue there is whether the voluntary dismissal was properly granted by the trial court. So the issue is not award of costs and expenses. And as you know, the court has very little discretion when ruling on a motion for voluntary dismissal. That being said, that does not mean the court cannot attach consequences to the execution or exercise of that right. And that's what these cases we've cited stand for. Right. But those happen in the first case, right? So you want to voluntarily dismiss and with leave to refile, then you're going to pay X dollars, including all those costs. And then if he doesn't do that, because that may affect somebody's decision whether or not, do I really want to voluntarily dismiss this, I'm going to refile it, I'm going to have to pay all that, as opposed to saying, no, I'm only going to, you know, 100 bucks. And then when you refile it, oh, by the way, now you're going to pay that 22K they asked for in the first case. I agree with Your Honor. And in fact, the Jones case we cited in the briefs, they say the purpose of the award of costs and expenses is to enhance the monetary burden associated with a voluntary dismissal. It's to make litigants think twice before they do something like this. Because they do recognize it is a burden and an inconvenience on the defendant. And granted, that burden and inconvenience is not relevant to the decision or the determination whether he can exercise the right to voluntarily dismiss, but it is absolutely relevant and important. But if you only do it on the second filing in the new case, how does that work? I mean, the idea would be you assess it as a condition of voluntary dismissal in the first case, and that didn't happen. No, I think it was as a condition of the voluntary dismissal. Again, the trial court, and I'd have to look back at the transcript to see exactly how it was phrased, but there's no question the plaintiff was allowed to exercise his right to voluntarily dismiss. But he wasn't told if he refiled he was going to have to pay $22,000. No, I disagree, Judge. In fact, I think if you look at the cases, that is not proper. The court cannot condition the refiling on the payment of those costs and expenses. It is something the plaintiff must pay. I don't think the trial court judge has authority to prevent the plaintiff from refiling unless he pays those costs and expenses. He can deny the voluntary dismissal if he doesn't pay the expenses. Judge, my read of the case is the trial court's hands are tied, and there is very little discretion. It's almost the unfettered right to voluntarily dismiss, to use the language in some of the cases. But again, that does not mean that the defendant's rights are not counterbalanced against that right to voluntarily dismiss. And I think that's, again, what these cases talk about. And I would point out, too, it was taken, as the trial court found, I believe, to avoid going to trial, to avoid a potentially adverse result at trial. That is not a proper... Isn't that one of the reasons that sort of trumps the unfettered right? I mean, you said that plaintiffs have an almost absolute right to voluntarily in a non-specific case to dismiss it, and that's what you said was your reason that you wouldn't appeal it, except that the judge makes the finding that that's why they've moved to voluntarily dismiss the case. I mean, wouldn't you think you'd have a good record for that? I think the issue, should we have taken the appeal of the order of voluntary... And for the record, we did object initially because it is an unfettered right before trial or hearing has begun. We made the argument back in January 2011 that he shouldn't be allowed to voluntarily dismiss because we had a five-day preliminary injunction hearing, which either was a hearing or a functional equivalent of a trial, in our view. The judge did the research. He gave us a couple days to brief it, and he came back and concluded properly, probably, that his hands were tied. The plaintiff had near unfettered right to voluntarily dismiss it. But again, when that dismissal was taken for an improper purpose and the trial judge makes the finding that it was taken for an improper purpose, it is appropriate under Rule 219 to assess costs and expenses in favor of the defendant. In that case. In that case. This new case is a new filing, is it not? Correct. However, the judge, number one, took the matter under advisement prior to approving the order of voluntary dismissal. Moreover, if you look at the language in both 219E and 219C, 219E specifically says the court, when fashioning a remedy, may consider misconduct in the prior action. That's in quotes. So that indicates the trial court judge has authority. But 219 is a discovery rule, isn't it? It is not entirely a discovery rule. In fact, we point out in the briefs it refers to, it includes Rule 218, which is the rule governing case management conferences and the issuance of case management orders, which is exactly the order the trial court judge found was violated in this case. I mean, just as a side note, I heard you recited this for 20 years. And so let's move on. What about the change the judge thinks? Yes. It appears to me, based on counsel's brief and perhaps his argument today, that he concedes Judge Stango made substantial rulings and his client had an opportunity to test the waters before Judge Stango, before making the motion for substitution. His whole argument before this court is based on the premise that this was a new case. However, there have been numerous Illinois Supreme Court and appellate court decisions that have expressly and or implicitly rejected that distinction, starting with the part of pillow case, 2002, from the 1st District. It was perhaps the most compelling illustration. You had three separate cases, a divorce case, a declaratory judgment case, and a chance for proceeding. The wife had filed a motion to stay in the divorce case. It was heard and denied by Judge Lawrence. She then went off and filed a new, separate, distinct, indisputably separate, distinct lawsuit, the declaratory judgment case, asking for a declaration that yet a third case should be allowed to proceed before the divorce case. That was then assigned back to Judge Lawrence, who had already ruled on the wife's motion to stay and denied it. The wife then says, Aha, this is a new case. I get to make a motion for substitution of judge as of right. Judge Lawrence denies that. It goes up. The appellate court agrees that it was appropriate to deny that motion for substitution of judge. They say the relief she was seeking in that declaratory judgment case, that separate, distinct case, was merely a repackaging, their words, a repackaging of the relief she sought through her motion to stay filed in a divorce case. So they said, You've already had your go at it before Judge Lawrence. We're dealing with, again, we concede a separate, distinct lawsuit, but it's in the same parties, the same issues, the same underlying facts. And that's the theme that develops in all of these cases. You're not going to be allowed to undermine the policy prohibiting a substitution of judge after you've had substantial rulings or an opportunity to test the water. Let me, you know, in a big city I suppose folks might think like that. But let me ask you, downstate, up here in the boondocks, somebody is a local lawyer and he knows Judge X doesn't like, and let's say I represent drunk drivers or those accused of drunk driving. And I know this judge is always whacking them pretty hard. And I think he's unduly severe. So I get Client A, and I take him in. He gets convicted and maxed out on the sentence. And then lo and behold, I get Client A again, same charge, now a different case, same charge, or for that matter, other clients. So I know I can take a change from him on that other case, right? And it's Judge Schott, and you're thinking, I don't want this judge, because I know he's not prone to think the way I'd like him to think. In that scenario, Your Honor, I believe you could take a motion for substitution, Judge. You're not talking about the same underlying facts and the same issues. Here, this was exactly what the part of pillow court said was a repackaging of the claims asserted in that original action. They had been asserted. We litigated the case for 27 months before Judge Stengel. We had a preliminary injunction hearing. He denied the motion for preliminary injunction. He granted partial summary judgment in our favor on one of the issues. There were numerous substantial rulings, Your Honor. So I believe this is an entirely appropriate case for denying the motion. Well, and there's no Supreme Court case that says what you want it to say, is there? There is, Judge. That is the Imre Kozlov decision from 1984 by the Illinois Supreme Court. This was a divorce proceeding. The husband had filed a petition to modify maintenance after the divorce decree was entered. It was assigned to Judge Burks. Meanwhile, Judge Burks enters an order to show cause against the husband for failure to pay maintenance. So the husband voluntarily dismisses that proceeding, goes off and refiles it before another judge. It's then sent back to Judge Burks. The husband says, new case, new proceeding. I get my substitution as judge. Initially, it goes up to the appellate court, and the appellate court agrees. They say, you're right. New proceeding. You get your substitution. It goes up to the Illinois Supreme Court, and they reverse. And there's a very terse pronouncement of the policy underlying the rule by the Supreme Court. They say, this court has long condemned a litigant's attempt to seek a change of venue after he has formed an opinion based upon the court's adverse rulings that the judge may be unfavorably disposed towards his cause. And that's exactly what happened in this case. The motion for substitution was made 27 months into the litigation in a new case, admittedly, that involved the same parties, the same issues, the same underlying facts. It was, at best, a repackaging of the relief sought in the underlying case. It was probably a restatement. It was the exact same case. I don't think your opponent even disputes that. His question is that it is the same case. All right. Thank you. Okay. Counsel, some rebuttal? With regards to the new case issue and whatnot, I will rest on our analysis in the brief. I go back to this issue of we talked about the low case. And the premise in the low case was that, of course, the danger must be genuine and imminent. Otherwise, it's arbitrary and capricious. We proposed to have the representatives who were fair hearing panel members, we proposed physician experts to show and testify at trial that Dr. Ramos did not pose an imminent danger, did not pose any danger. We proposed to show the jury that the fair hearing panel found that. The judge barred all of that. The judge barred specifically any testimony from us about imminent danger, whether Dr. Ramos did or didn't pose an imminent danger. Well, let me see your argument. Would you agree that at that trial the issue was not whether Dr. Ramos was a good doctor or a bad doctor? That's correct. But whether they followed their bylaws and whether the proceeding was fair, and your point of this evidence was to show not that he was a good doctor, but that it wasn't fair in the sense that something happened that caused that report to get changed. That's correct. That's correct in a nutshell. And, you know, they say, well, what would it matter? Well, we were never even given a copy of that original report, so we never, in the underlying fair hearing and the appellate review, we never even learned about that, the fact that there was an original report that didn't even contain the word imminent threat of patient safety.  Well, it doesn't because the judge barred it. Now, what the judge did allow was it allowed the defendant to say, well, we relied on this report and there were some bad things in the report, and that's where we said that's fundamentally unfair. You can't allow this presumption or the implication that there is a bad report out there and then not allow us to depose the authors or to rebut that, and it doesn't show up because the judge refused to allow that in, and also it refused to allow us to present any evidence that that wasn't the case. Did you tender it? I mean, is that report, did you tender it into evidence? It is in the case. It was not allowed into evidence at trial. Okay, at trial, but it was, you did tender it and it was refused. Yes. And so it's in the record. There was a motion in limine, and I don't remember. I've got to say I don't remember. He barred it. I know that. But there's abundant testimony about it, but at the same time the court wouldn't allow us to even say what the difference was. The defendant alleged, well, these were just a few minor changes. No. The difference was the first report had nothing about potential imminent threat of patient safety, and the report that the board was shown and everybody was shown was this potential imminent threat, and we wanted to discover that and we wanted to prove that, that there was no basis in that. Thank you, Your Honor. All right, thank you. Thank you both for your arguments here this afternoon. The matter will be taken under advisement. A written disposition will be issued. And right now the court will be in a brief recess.